**GP**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

-------------------------------------------------------- X

UNITED STATES OF AMERICA, *ex rel.,*
JANE DOE, JANE ROE, and STOP
COMMUNITY HOSPITAL UPCODING,
LLC,

                    Plaintiffs,

      V.

PRIME HEALTHCARE SERVICES, INC.,
ROXBOROUGH MEMORIAL HOSPITAL,
LOWER BUCKS HOSPITAL, PREM
REDDY, M.D. and PETER ADAMO,

                 Defendants.

--------------------------------------------------------

Civil Action No. **14     1695**

**Filed Under Seal
Pursuant to
31 U.S.C. § 3730**

**FILED**

MAR 21 2014

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

## COMPLAINT OF THE UNITED STATES

    The United States of America (the "Government"), by and through their *qui tam* Relators,

Jane Doe, Jane Roe, and Stop Community Hospital Upcoding, LLC (the "Relators") bring this

action under the Federal False Claims Act, 31 U.S.C. § 3729-3733, *et seq.* (the "False Claims

Act") against Prime Healthcare Services, Inc. ("Prime") and two Southeastern Pennsylvania

hospitals that Prime acquired in 2012:  Roxborough Memorial Hospital ("RMH"), and Lower

Bucks Hospital ("LBH"), as well as Dr. Prem Reddy ("Reddy"), founder and Chairman of the

Board of Directors of Prime, and Peter Adamo ("Adamo"), the Chief Executive Officer of RMH

and LBH ("CEO") (collectively, "Defendants") to recover all damages, penalties, and other

remedies provided by the False Claims Act on behalf of the United States and the Relators, and

for their complaint allege:

    1.    Based on the Relators' personal knowledge and further investigation, from at least

February 22, 2012 through the present, sufficient evidence, including statements by the Relators as well as documents and other information they have obtained, exists to allege that Defendants have violated and continue to violate the False Claims Act, 31 U.S.C. § 3729, by: (1) upcoding, or falsifying information concerning the conditions and comorbidities associated with patients' diagnoses in order to wrongfully increase the MS-DRG payments (defined herein) Prime receives from Government health programs; (2) forbidding staff to treat patients on observation status and instead forcing them to admit the patients in almost every instance, regardless of whether the patient meets the criteria for inpatient admission; (3) discharging patients prematurely to maximize the profit realized on Medicare payments for inpatient care; and (4) refusing to readmit emergency room patients that were recently discharged in order to avoid a reduction in Prime's Medicare reimbursement payments for inpatient care at RMH.

## PARTIES

2.      Jane Doe has been an employee at RMH for over ten years, dating back to when RMH was a community hospital. Jane Doe has served in a host of capacities during her time at RMH, including fixing Medicare diagnostic codes that were incorrectly coded. Currently, Jane Doe is a Point of Care Coordinator, where her duties focus on, among other things, training doctors on RMH's system, handling medical reports, making systems compliant for nurses, and data collection. Jane Doe's tenure at RMH has provided her with substantial information regarding RMH's system and practices, as well as Defendants' fraud described herein.

3.      Jane Roe has been an employee of RMH since 2012. Jane Roe is an Application Analyst, and her duties focus on creating medical documents, application support, troubleshooting support, and training RMH staff on the system and applications.

2

4.      Stop Community Hospital Upcoding, LLC is a Delaware corporation whose main address is 800 Delaware Avenue, Wilmington, DE, and which was formed for the purpose of bringing this action.

5.      Plaintiff United States of America, acting through the Department of Health and Human Services ("HHS"), and its Centers for Medicare and Medicaid Services ("CMS"), administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq*. ("Medicare").

6.      Defendant Prime is a California-based health system that owns and operates 25 acute care hospitals nationally. Prime acquired RMH in February 2012 and LBH in October 2012.

7.      Defendant RMH is a 141-bed Prime-owned hospital located at 5800 Ridge Ave, Philadelphia, PA. Roughly 80% of RMH's patients are Medicare subscribers.

8.      Defendant LBH is a Prime-owned hospital located at 501 Bath Rd, Bristol, PA.

9.      Defendant Reddy is the founder of Prime and Chairman of Prime's Board of Directors. Reddy actively and *personally* oversees the acquisition and integration of all new hospitals acquired by Prime, including implementing uniform protocols at all Prime facilities.

10.     Defendant Adamo is RMH's and LBH's CEO.  Adamo was and is actively involved in integration of RMH into Prime, as well as ensuring that all Prime policies are implemented and applied to RMH. Adamo has served as RMH's CEO since March 2012 and LBH's CEO since October 2012.  Prior to joining RMH, Adamo was an administrator at Alvarado Hospital, another Prime hospital accused of fraudulent practices similar to those occurring at RMH and LBH.

## JURISDICTION AND VENUE

11.     Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. § 1331.

12.     The Court may exercise personal jurisdiction over the Defendants, and venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts proscribed by 31 U.S.C. §§ 3729 *et seq*., and complained of herein took place in part in this District and the Defendants transacted business in this District as described herein.

13.     Pursuant to 31 U.S.C. § 3730(b)(2), Relators prepared and will serve the complaint on the Attorney General of the United States, and the United States Attorney for the Eastern District of Pennsylvania, as well as a statement of all material evidence and information currently in its possession and of which it is the original source. These disclosure statements are supported by material evidence known to the Relators at the time of filing establishing the existence of Defendants' false claims.     Because the statements include attorney-client communications and work product of Relators' attorneys, and will be submitted to those Federal officials in their capacity as potential co-counsel in the litigation, Relators understand these disclosures to be confidential and exempt from disclosure under the Freedom of Information Act. 5 U.S.C. § 552; 31 U.S.C. § 3729(c).

## LEGAL BACKGROUND

### *The False Claims Act*

14.     The False Claims Act provides, in pertinent part:

(a) Liability for Certain Acts.—

(1) In general.— Subject to paragraph (2), any person who—

4

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

(E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

 (3) Costs of civil actions.— A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

(b) Definitions.— For purposes of this section—

(1) the terms "knowing" and "knowingly"—

(A) mean that a person, with respect to information—

(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud;

(2) the term "claim"—

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

(3) the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

15.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as

amended by the Debt Collection Improvement Act of 1996, 28 C.S.C. § 2461 (notes), and 28

C.F.R. § 85.1, False Claims Act civil penalties were increased from $5,000 to $11,000 for violations occurring on or after September 29, 1999.

## FACTUAL BACKGROUND

### I.    Overview of Medicare and its Benefits

16.    Medicare is a federal health insurance system for people 65 and older and for people under 65 with certain disabilities.  The United States Department of Health and Human Services, and its Centers for Medicare and Medicaid Services ("CMS"), administer Medicare and Medicaid.

### A.    Inpatient Care

17.    In an effort to combat Medicare fraud and abuse, CMS has increased scrutiny on the medical necessity of short stay inpatient hospital admissions. Due to the greater reimbursement for inpatient services versus observation services, the Government requires strict adherence to inpatient admission rules.

18.    Chapter 6, Section 6.5.2 of the Medicare Program Integrity Manual states that:

[I]npatient hospital care [must be] medically necessary, reasonable, and appropriate for the diagnosis and condition of the beneficiary at any time during the stay. The beneficiary must demonstrate signs and/or symptoms severe enough to warrant the need for medical care and must receive services of such intensity that they can be furnished safely and effectively only on an inpatient basis.[1]

19.    Chapter 1, Section 10 of the Medicare Benefit Policy Manual[2] sets forth the following factors that should be considered by a physician when deciding whether to admit a

---

[1] Medicare Program Integrity Manual, Chapter 6, *available at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/pim83c06.pdf. (hereinafter "MPIM").

[2] Medicare Benefit Policy Manual, Chapter 1, *available at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/bp102c01.pdf.

patient as an inpatient: the severity of the signs and symptoms exhibited by the patient; the medical predictability of something adverse happening to the patient; the need for diagnostic studies that appropriately are outpatient services to assist in assessing whether the patient should be admitted; and the availability of diagnostic procedures at the time when and the location where the patient presents.

20.     Hospitals are reimbursed by Medicare for the services they provide to inpatients on the basis of diagnosis related groups ("DRGs") and to outpatients on the basis of Ambulatory Payment Classifications ("APCs").  On average, Medicare pays approximately $4,500 to $5,000 more for a DRG than for an APC with its bundled observation fee.  Therefore, improperly billing for just one inpatient stay which should have been classified as observation status every day would result in about $1.7 million in overpayments from Medicare annually.

### B.     Duty to Report and Return Overpayments from Medicare

21.     The provisions and framework for the treatment of overpayments is straightforward.  The Medicare and Medicaid Program Integrity Provisions, 42 U.S.C. § 1320a-7k(d), state:

**(d) Reporting and returning of overpayments**

**(1) In general**

If a person has received an overpayment, the person shall--

    (A) report and return the overpayment to the Secretary, the State, an intermediary, a carrier, or a contractor, as appropriate, at the correct address; and

    (B)  notify the Secretary, State, intermediary, carrier, or contractor to whom the overpayment was returned in writing of the reason for the overpayment.

**(2) Deadline for reporting and returning overpayments**

8

An overpayment must be reported and returned under paragraph (1) by the later of--

> (A) the date which is 60 days after the date on which the overpayment was identified; or

> (B) the date any corresponding cost report is due, if applicable.

**(3) Enforcement**

Any overpayment retained by a person after the deadline for reporting and returning the overpayment under paragraph (2) is an obligation (as defined in section 3729(b)(3) of title 31) for purposes of section 3729 of such title.

## II.   Prime's Fraudulent Scheme

### A.   False Claims Act Violations

#### 1.   Defendants Engage in Upcoding in Order to Increase the Reimbursement Rates Received From Medicare.

22.     First, Defendants are and have been defrauding Medicare by submitting or causing the submission of false or fraudulent claims for payment. According to Relators, Defendants have all but forbidden RMH staff from diagnosing anything but conditions associated with high-reimbursement MS-DRGs. Specifically, Relators state that Defendants are increasing revenues at RMH by retraining and effectively precluding physicians from diagnosing patients with conditions associated with low Medicare reimbursement rates.  Prime physicians are functionally required, instead, to diagnose patients with similar – but reimbursable at a higher level – conditions.

23.     By way of background, Medicare reimburses hospitals such as RMH for inpatient services under the Medicare Inpatient Prospective Payment System ("IPPS"). Under IPPS, written descriptions of diseases, illnesses, and injuries are translated into codes, known as ICD-9 Procedure Codes and ICD-9 Diagnostic Codes.  Each code determines the appropriate MS-DRG classification, which, in turn, determines the appropriate reimbursement rate.  MS-DRGs may be

further refined with the following descriptions: with major complication and comorbidities ("MCC"); with complications and comorbidities ("CC"); or without complications and comorbidities ("without MCC/CC"). Complications and comorbidities typically increase the reimbursement rate for an MS-DRG. Thus, patients' complications and comorbidities must be accurately recorded in order to ensure that the hospital is appropriately reimbursed by Medicare.

24.    According to Relators, Defendants force RMH staff to diagnose and/or code for conditions with higher Medicare reimbursement rates and similar diagnosis criteria instead of conditions that more accurately capture the symptoms and conditions but that have lower reimbursement rates. According to Relators, Defendants train Prime physicians to "diagnose based on what works with the DRG codes" and not what necessarily most accurately reflects the patient's condition.    Defendants accomplish this by encouraging caregivers to add absent complications or comorbidities to their diagnosis and, for those physicians that do not "play along," forcing adherence to such practices through its Clinical Documentation Specialists ("CDS") team's use of tactics designed to humiliate physicians and threaten their job security.

25.    Specifically, when Prime acquired RMH, it installed a CDS team at the hospital.[3] CDS team members are direct employees of Prime.[4]  The purpose of a CDS team is ostensibly to ensure that the Company's physicians are accurately diagnosing patients with the appropriate conditions reflecting the symptoms with which they present.  This, however, is not their true purpose.  Instead, according to Relators, the CDS teams exist to ensure that doctors comport their diagnoses to fit the specific MS-DGRs – even if they are not accurate – that generate the highest reimbursement for the hospital.

---

[3] According to Relators, a CDS team of between three to five members is installed at every healthcare facility acquired by Prime, shortly following the acquisition.

[4] According to Relators, CDS team members are trained by Prime, managed by Prime, and report to Prime.

10

26.     To achieve the foregoing, the CDS team inserts itself between physicians'
diagnoses and coding for Medicare reimbursements.  This is done through Concurrent Review, a
CDS practice whereby all physician diagnoses are reviewed within 24 hours by CDS – before the
diagnosis is finally and formally entered into the patient's medical records.[5]  On review, if CDS
determines that a physician's diagnosis is "incorrect" – a euphemism for a diagnosis that is close
in nature to a similar diagnosis that is reimbursable at a higher rate – CDS initiates a query.[6]
When a physician is subject to a CDS query, the physician is required to provide a post-hoc
justification for the diagnosis and provide additional information in the patient's chart.  CDS
queries are accompanied by a Physician Query Form,[7] which is frequently hand-delivered to the
physician by a CDS team member who explains coding definitions of higher reimbursement MS-
DGRs in order to inform and steer the physician's diagnosis.   Virtually every time CDS
determines a physician has misdiagnosed a patient, the alternative diagnosis encouraged by CDS
carries a higher Medicare reimbursement rate.

27.     To prevent physicians from diagnosing patients with conditions associated with
low reimbursement rates (that is, to make sure that CDS team interventions result in adoption of
the alternative diagnosis suggested by CDS) the CDS teams engage in "informative
explanations."     An "informative explanation" is, essentially, a public admonishment
administered by the CDS team to a recalcitrant physician.  In an "informative explanation" a
CDS team member will loudly and publicly – in front of physician colleagues and hospital staff –
belittle a physician for failing to properly diagnose a patient.  The CDS team member will then

---

[5] RMH did not have Concurrent Review prior to being acquired by Prime.

[6] According to Relators, when CDS determines a physician's diagnosis is incorrect, it means that
CDS has determined that the diagnosed condition is associated with a low reimbursement MS-
DRG code.

[7] Attached as Exhibit 1 is a Physician Query Form for Syncope from RMH.

condescendingly "explain" to the physician why his or her diagnosis is incorrect. If a physician fails to concede that the diagnosis offered by the CDS team member is correct, it will be insinuated to the physician that their job is in jeopardy if they continue to diagnose patients with conditions that result in lower-level reimbursable conditions. Additionally, not only is the CDS query process designed to pressure the queried physician into compliance with Defendants' fraudulent coding policy, but by conducting these explanations in public other RMH physicians are discouraged from diagnosing conditions with low reimbursement rates.

28.     To further threaten the job security of noncompliant physicians, physicians that fail to answer a query within 14 days are suspended.[8] This is a "zero tolerance" rule. When a physician is suspended for failing to answer a query, a notification is circulated throughout RMH notifying staff of the physician's suspension and that the physician is no longer allowed to admit or treat patients at RMH. The suspended physician is not reinstated until after the query is resolved to the satisfaction of the hospital. This practice serves several purposes. First, as stated above, this practice makes very clear that a physician's failure to comply with Defendants' upcoding practices will put their jobs in jeopardy. Second, by sending a notification of the physician's suspension to RMH staff, suspended physicians are further humiliated in front of their peers. Suspensions also serve to damage a physician's relationship with his or her patients – if a physician is unable to admit and treat his or her patients at their preferred hospital, he or she risks losing the individual as a patient. Lastly, this practice also allows Defendants to intimidate other physicians. If a physician receives a notification that a colleague has been suspended for failing to resolve a query, they are also aware that failure on their part to comply with

---

[8] According to Relators, prior to Prime's acquisition of RMH, physicians were provided 28 days to complete queries, and even if a physician failed to complete it by the 28 day mark, they were rarely, if ever, suspended.

Defendants' upcoding practice will similarly place their jobs in jeopardy and humiliate them in front of their peers.

29.     According to Relators, Defendants' implementation of CDS team reviews and its query practice have proven to be a very effective mechanism to coerce physicians into diagnosing conditions with high reimbursement rates. According to Relators, since these procedures were implemented, the number of queries that the CDS teams have needed to perform have declined strikingly. This is because, according to Relators, RMH physicians now understand that if they do not fall in line with Defendants' fraudulent coding practices they will be placing their jobs in jeopardy and subject themselves to public humiliation.

30.     As a result of Defendants' fraud, RMH's billing has changed radically. That is, since Prime's acquisition of RMH in February 2012, RMH has had a significant decrease in billing for conditions with low reimbursement MS-DRG codes and a simultaneous increase in billing for conditions with similar diagnosis criteria but higher reimbursement rates. Below is a table, also attached as exhibit 2, demonstrating this change in billing at RMH since its acquisition by Prime in February 2012:

Table 1. MD-DRG frequency by year at RMH.

|  | **MS-DRG Code and Description** | **RMH Rate** | **2011** | Prime acquires RMH (Feb.) 2012 | **2013** | **2011/2013 % change** |
|---|---|---|---|---|---|---|
| *Compare:* | 312: Syncope & Collapse | $4,096 | 108 | 113 | 90 | (17%) |
| *With, e.g.:* | 074: Cranial & Peripheral Nerve Disorders w/o MCC | $5,046 | 13 | 21 | 17 | 30% |
| *Compare:* | 641: Misc. Disorders of Nutrition, Metabolism, Fluids/Electrolytes w/o MCC | $3,978 | 77 | 71 | 50 | (35%) |
| *With, e.g.:* | 640: Misc. Disorders of Nutrition, Metabolism, | $6,377 | 19 | 31 | 29 | 53% |

|  | Fluids/Electrolytes w/MCC |  |  |  |  |  |
| --- | --- | --- | --- | --- | --- | --- |
| *Compare:* | 192: Chronic Obstructive Pulmonary Disease w/o CC/MCC | $4,000 | 88 | 45 | 17 | (81%) |
| *With, e.g.:* | 189: Pulmonary Edema & Respiratory Failure | $7,400 | 15 | 98 | 112 | 646% |
| *Compare:* | 690: Kidney & Urinary Tract Infections w/o MCC | $4,495 | 102 | 47 | 34 | (67%) |
|  | 689: Kidney & Urinary Tract Infections w/ MCC | $6,789 | 34 | 33 | 22 | (35%) |
| *With, e.g.:* | 872: Septicemia or Severe Sepsis w/o MV 96+ Hours w/o MCC | $6,318 | 20 | 43 | 77 | 285% |
|  | 871: Septicemia Or Severe Sepsis w/o MV 96+ Hours w/ MCC | $10,792 | 74 | 200 | 297 | 301% |
|  | 870: Septicemia or Severe Sepsis w/ MV 96+ Hours | $33,519 | 8 | 13 | 29 | 263% |

31.     The data summarized in Table 1 demonstrates the fruit of a concerted effort by Defendants to eliminate billing for relatively low reimbursement MS-DRGs in favor of similar, but higher-reimbursable MS-DRGs. For example, Medicare reimburses approximately $4,100 per hospitalization for patients diagnosed with syncope (fainting), rendering it a relatively low reimbursement MS-DRG condition. Since Prime took over RMH in February 2012, billing for syncope has declined 17%. *See* Table 1. This is no coincidence. If a physician diagnoses syncope, a query is automatically initiated. When a query is initiated for syncope, the CDS staff member inquires as to why the patient was fainting. Then, armed with that information, CDS determines what the correct (and reimbursable at a higher rate) diagnoses should have been and convinces the physician to change his or her diagnosis accordingly. Not surprisingly, CDS's "correct diagnosis" is always that the patient does not have syncope, but instead has a more

14

serious condition that carries a higher reimbursement rate, such as "Cranial & Peripheral Nerve Disorders w/o MCC" which reimburses approximately $5,046 per hospitalization – or approximately $1,000 more than syncope. Additionally, according to an RMH employee in the medical records department who spoke with Relators, RMH employees were recently and expressly instructed "not to use that [syncope] code anymore."

32.     According to Relators, a large majority of RMH's patients are older individuals whom have been patients of RMH for many years and patronize the facility repeatedly. This fact makes the numbers shown above even more telling because not only is RMH now diagnosing more patients with conditions that carry high reimbursement rates, but the patients being diagnosed with these conditions are the *same* patients that were previously diagnosed with similar conditions associated with a lower reimbursement rate. Relators believe that substantial information confirming this fact on a patient-by-patient basis would be discoverable from RMH's medical records. Therefore, since Prime acquired RMH, RMH's patients and their medical conditions have not changed, however, they are no longer diagnosed with conditions consistent with their medical history. Significantly, the conditions RMH's patients historically have been diagnosed with have drastically declined in favor of other conditions that have a higher Medicare reimbursement rate. The most credible explanation for this change in condition of RMH's patients is that Defendants are upcoding to receive higher reimbursements from the Government. The only other "explanation" for the sudden shift in diagnoses at RMH would be that members of the Roxborough community *as a whole* abruptly stopped suffering from common ailments such as syncope and COPD once Prime acquired their hospital (as did the residents of other U.S. towns following a Prime acquisition) and suddenly were afflicted with similar conditions that were reimbursable at a much higher rate by Medicare.

15

33.     That the foregoing is directed from the highest levels is beyond credible dispute.

For example, on April 11, 2013, at an RMH employee forum, Defendant Adamo praised the

foregoing and attributed the practice's effect to RMH's profitability, stating in relevant part:

> On this next line we have [the] net revenue for adjusted patient case statistics.
> This is **moving very nicely in the right direction. Anybody want to guess what
> might be driving up our net revenue for adjusted occupied bed per day . . .?**
> **[Audience member: 'documentation?'] Yeah . . . documentation . . .**
>
> Everybody hopefully knows what a DRG is. Inpatients get a diagnostic related
> group . . . what their diagnosis is. Medicare assigns a dollar . . . a weighted value
> to each one of those diagnoses. **The higher the acuity of those diagnoses, the
> more we receive in Medicare payments.** And that's the key because as I've
> mentioned before 80% of our patient volume is either traditional or managed
> Medicare. That's how they pay us. **The higher the acuity, the more money we
> make . . .** [9]

34.     Adamo's statement makes clear that the primary purpose of these billing practices

is to increase revenue, and not to improve documentation or querying practices. Notwithstanding

his use of the word 'documentation,' Adamo's speech clearly demonstrates that RMH's ticket to

increased revenue is billing for higher reimbursement MS-DRGs —"the *higher the acuity of*

*those diagnoses*, the more money we make . . ."— not better documentation of conditions

currently observed.   Forbidding caretakers from using certain MS-DRGs does not improve

documentation; it results in the substitution of MS-DRGs with higher reimbursement rates.  Nor

is this merely a case where RMH has optimized diagnoses through its querying process.

According to the American Health Information Management Association's *Guidelines for*

*Achieving a Compliant Query Practice* ("AHIMA Guidelines"),[10] querying is not a tool to weed

---

[9] In October 2012, Prime took over LBH.  Adamo serves as CEO for both LBH and RMH, so it
is highly likely that he gave the same or a similar speech to LBH personnel and, more to the
point, that the same fraud described herein also occurs at LBH.

[10] The AHIMA is a 64,000 member professional organization that advances best practices and
standards for health information management and serves as a source for education, research, and
professional credentialing.

out low reimbursement MS-DRGs, but rather is "a communication tool used to *clarify* documentation in the health record for accurate code assignment" and is appropriate only in limited circumstances, none of which are reimbursement level driven.[11] That is, according to the AHIMA Guidelines, "[t]he final coded diagnosis and procedures derived from the health record documentations should accurately reflect the patient's episode of care." Defendants, however, use querying to force physicians to change their diagnoses to receive a higher reimbursement from Medicare.

35.     Indeed, Defendants' scheme is further problematic in that by coding and then documenting at the behest and direction of Prime's CDS team rather than exclusively documenting and coding according to the caregiver's actual observations, Defendants are putting patients at substantial risk. According to Relators, in order to conceal Defendants' upcoding practice, patients at RMH are treated as though they *actually have the condition that corresponds to the higher reimbursement DRG code*. That is, patients at RMH are receiving treatment for more serious conditions than is warranted based on their true medical condition. As a result, patients are routinely given stronger medications and are forced to undergo unnecessary procedures for the sole purpose of ensuring the treatment provided matches the DRG code billed to Medicare. Thus, Defendants are putting patients at RMH in danger by rendering medically unnecessary treatment, just so Defendants can mitigate the chances of their fraud being

---

[11] According to AHIMA Guidelines, the factors relevant to whether a query should be considered are whether the health record: "Is conflicting, imprecise, incomplete, illegible, ambiguous, or inconsistent; Describes or is associated with clinical indicators without a definitive relationship to an underlying diagnosis; Includes clinical indicators, diagnostic evaluation, and/or treatment not related to a specific condition or procedure; Provides a diagnosis without underlying clinical validation; and Is unclear for present on admission indicator assignment." AHIMA Guidelines, *available                                                                                                      at* http://library.ahima.org/xpedio/groups/public/documents/ahima/bok1_050018.hcsp?dDocName= bok1_050018.

17

discovered by authorities.

36.     Lastly, Defendants' fraudulent practices at RMH are consistent with those reported at Prime's California hospitals. According to trial testimony in *Desert Valley Hosp. v. Buchanan et al.*, Cal. Sup. No. VCVVS030193—a breach of contract/wrongful employment termination action—Prime increased revenues at acquired hospitals in California by, among other things, retraining caregivers not to diagnose patients with conditions associated with low Medicare reimbursement rates. Instead, caregivers were coached into documenting symptoms associated with comparable conditions that carried higher reimbursement rates under the guise of "querying."[12] And, more recently, the Court in *U.S. ex rel Berntsen v. Prime Healthcare Services*, CV 11-8214 FMO (MAN), C.D. Cal. 2011, unsealed the relator's complaint which alleges a similar fraudulent scheme occurring at Prime's California (rather than Pennsylvania) hospitals.[13]

## 2.     Defendants Forbid RMH Staff from Designating Patients as on Observation Status in Order to Receive the Higher Reimbursement Associated with Inpatient Care.

37.     Defendants are also defrauding the Government by admitting virtually all individuals who present to RMH, even when their conditions dictate that they should be placed

---

[12] Specifically, according to testimony in that case, Prime's founder, Prem Reddy, personally met with hospital coders on three to four occasions, instructing them, for example, that exacerbation of COPD was the "same as" and was to be coded as respiratory failure; renal insufficiency was the same as and was to be coded as acute renal failure (both replacements carrying higher MS-DRGs). Reddy referred to such coding as "thinking outside the box." Reddy further instructed coders to query physicians diagnosing low reimbursement conditions and to explain coding definitions of higher reimbursement DRGs in order to inform their diagnoses. This essentially led to coding *then* documenting accordingly rather than exclusively documenting and coding according to the caregiver's observations, just as here. Prime is being investigated in California for these practices.

[13] *Berntsen*, CV 11-8214 FMO (MAN), C.D. Cal. 2011, Second Amended Complaint, June 11, 2013 (D.E. 21).

on observation status, so that Prime would receive the higher reimbursement payments Medicare provides for inpatient care. Specifically, Defendants have forbidden RMH staff from placing patients on observation status, and instead force them to admit patients, in almost every instance, regardless of whether the patient meets the criteria for inpatient admission. As stated above, the Medicare Program Integrity Manual provides that:

> [I]npatient hospital care [must be] medically necessary, reasonable, and appropriate for the diagnosis and condition of the beneficiary at any time during the stay. The beneficiary must demonstrate signs and/or symptoms severe enough to warrant the need for medical care and must receive services of such intensity that they can be furnished safely and effectively only on an inpatient basis. [14]

38.   Observation services, on the other hand, "are short-term treatments and assessments provided to outpatients to determine whether beneficiaries require further treatment as inpatients or can be discharged."[15] Despite Medicare's explicit requirements concerning inpatient admissions, the Relators state that "RMH doesn't do observation status." In fact, according to Relators, the *only* time patients are treated on observation status is when they are merely intoxicated.

39.   Defendants engaged in this scheme because the reimbursement rate for inpatient treatment is significantly greater than the reimbursement rate for patients on observation status. For example, Medicare's reimbursement rate for chest pain treatment is approximately $720 if rendered on an observation basis, and approximately $7,600 if rendered on an inpatient basis.[16] Given this disparity, Defendants' refusal to allow physicians and staff to treat patients at RMH

---

[14] MPIM, *supra* note 1, at 7.

[15] *Memorandum Report: Hospitals' Use of Observation Stays and Short Inpatient Stays for Medicare Beneficiaries*, Department of Health and Human Services, Office of Inspector General (July 29, 2013), *available at* http://oig.hhs.gov/oei/reports/oei-02-12-00040.pdf.

[16] *See, e.g., Recent Growth in Hospital Observation Care*, MEDPac (Sept. 13, 2010), *available at* http://www.medpac.gov/transcripts/observation%20sept%202010.pdf.

on observation status and the unnecessary admissions it creates grossly increases the costs to Medicare. In addition, similar to the upcoding described above, this policy inhibits physician decision making, and violates a basic Medicare policy in the name of profit.

> **3.      Defendants Discharge Patients Prematurely and Refuse to Readmit Recently Discharged Patients in Order to Increase Medicare Reimbursement Payments.**

40.     In addition to the foregoing, Defendants have also defrauded the Government by: (i) refusing to admit patients (that otherwise met the criteria for inpatient admission) in order to prevent a decrease in its Medicare reimbursement payments under the Hospital Readmission Reduction Program ("HRRP"); and (ii) prematurely discharging patients to maximize its margin on Medicare inpatient reimbursement payments. These policies have resulted in substandard patient care and fraudulently obtained Medicare reimbursements.[17]

> **i.      Defendants Discharge Patients Prematurely.**

41.     As stated above, Hospitals such as the RMH are reimbursed for their inpatient services under Medicare's IPPS. For inpatient care, Hospitals are paid a predetermined amount on a per discharge basis for inpatient hospital services furnished to Medicare beneficiaries. 42 C.F.R. § 412.2. The predetermined amount which hospitals receive is determined by the DRG's geometric mean length of stay ("GMLOS"). 42 C.F.R. § 412.4. Each DRG has an associated

---

[17] According to CMS, hospital readmission rates are an important indicator of the quality of care a hospital provides. Data Shows Reduction in Medicare Hospital Readmissions Rates During 2012, 2013 Medicare and Medicaid Research Review 3(2), *available at* http://www.cms.gov/mmrr/Downloads/MMRR2013_003_02_b01.pdf.      According to CMS, RMH's rate of readmission after discharge is "Worse Than U.S. National Rate." Rate of Readmission After Discharge From Hospital (hospital-wide), 30 Day Outcomes: Readmission and Death Rates Details, *available at* http://www.medicare.gov/hospitalcompare/details.html?msrCd=prnt3grp1&ID=390304&stCd=PA&stName=PENNSYLVANIA.

GMLOS, which proscribes the number of days of inpatient care Medicare will reimburse a hospital for based on the patient's condition. *Id.* Hospitals are reimbursed for the entire GMLOS period, regardless of how many days the patient actually remains in inpatient care. 42 C.F.R. § 412.2; 42 C.F.R. § 412.4. That is, Medicare reimburses hospitals for inpatient care with a predetermined amount based upon the DRG's GMLOS, regardless of how long the patient actually remains in inpatient care. Therefore, the margin for a patient's inpatient care *increases* for each day the patient is discharged *before* reaching the GMLOS for whichever condition the patient was admitted.

42. As part of their scheme to defraud the government, Defendants are instructing RMH staff to discharge patients prematurely in order to maximize its inpatient treatment margins. Specifically, according to Relators, Defendants have implemented a policy of instructing physicians to discharge patients before they meet the GMLOS. By discharging patients prematurely, Defendants are able to increase the RMH's per patient margin on inpatient care. That is, by prematurely discharging patients before the GMLOS, Prime is able to devote fewer beds and less resources to the treatment of each inpatient while, at the same time, receiving the same amount from Medicare that it would have received if it had kept each inpatient for the GMLOS. As a result of this practice, patients at RMH that are prematurely discharged are receiving substandard care, increasing the likelihood that these patients will need future care to compensate for the fact that they are being discharged before fully treated, and Prime is receiving full Medicare reimbursement for providing this substandard care.

### ii.    Defendants Refuse to Readmit Recently Discharged Patients.

43. Section 3025 of the Affordable Care Act added section 1886(q) to the Social Security Act establishing the HRRP, which requires CMS to, among other things, reduce

payments to hospitals with excess readmissions.[18]  Under the HRRP, a readmission occurs when "an individual who is discharged from an applicable hospital, [is then admitted] to the same or another applicable hospital within a time period of 30 days from the date of such discharge." 42 C.F.R. § 412.152. The HRRP reduces Medicare payments to hospitals for each instance where a patient is readmitted for certain conditions specified by CMS.[19] 42 C.F.R. § 412.154.

44.     In addition, Defendants have compounded their misconduct (and the harm to patients) by refusing to readmit patients that were recently discharged.  Specifically, and despite the fact that from a medical standpoint they should be readmitted, Defendants have and are instructing RMH's Emergency Room ("ER") physicians not to admit patients that have been discharged within the past 30 days in order to prevent a reduction in its Medicare reimbursement under the HRRP.  According to Relators, if a patient is discharged and later returns to RMH for treatment (which typically occurs through the ER), Defendants have expressly implemented procedures that physicians are to do everything in their power to prevent the patient from being readmitted.

45.     To achieve this end, Defendants added a Utilization Review specialist ("URS") to work the ER floor at all times.  When a Medicare eligible patient who was discharged within the past 30 days returns to RMH for treatment, the URS immediately alerts ER physicians and nurses that this patient was recently discharged.  According to Relators, when physicians receive

---

[18] The penalty is computed based on readmission rates for the most recent three years of data available; therefore the 2013 penalties were based on data for 2009, 2010, and 2011. Report to Congress: Medicare and the health care delivery system, p. 98 (June 2013), *available at* http://www.medpac.gov/documents/Jun13_EntireReport.pdf.

[19] In fiscal years 2013 and 2014, the readmission reduction program applies to three conditions: AMI, heart failure, and pneumonia. In fiscal year 2015, the program will be expanded to at least four additional conditions, including: chronic obstructive pulmonary disease, percutaneous transluminal coronary angioplasty, coronary artery bypass graft surgery, and other vascular conditions as well as other conditions the Secretary deems appropriate. *Id.*

this notification, it means that the physician is "not [to] admit this patient." Unfortunately, RMH physicians have complied, and Defendants' rule has had a profound impact. First, patients receive substandard and/or dangerously absent care: patients that should be admitted for serious medical issues are not admitted, but are instead given perfunctory care on an emergency/outpatient basis. Second, this practice improperly increases Defendants' profits at the expense of the Government because, had such patients been properly readmitted, Defendants would have had to return a portion of the monies they had received for the patient's prior inpatient care. As a result, Defendants scheme has caused the Government to overpay for inpatient treatment.

### 4.    **Fraudulent Activity at LBH.**

46.    Relators are long-time employees of RMH and do not have any direct information regarding Defendants' fraudulent practices at LBH. However, Prime took over LBH in October 2012 and Adamo serves as the Chief Executive Officer for both RMH and LBH.[20] In addition, billing for both RMH and LBH are performed at LBH. Therefore, it is reasonable to conclude that fraudulent practices similar to those occurring at RMH are also occurring at LBH.

### COUNT I
### (False Claims Act 31 U.S.C. § 3729(a))

47.    Relators repeat each allegation in each of the proceeding paragraphs of this Complaint with the same force and effect as if set forth herein.

48.    As described above, Defendants have submitted and/or caused to be submitted false or fraudulent claims to Medicare by upcoding, or falsifying information concerning the conditions and comorbidities associated with patients' diagnoses in order to wrongfully increase

---

[20] In addition, Matthew Shelak serves as the Chief Operating Officer for both RMH and LBH.

the MS-DRG payments Prime receives from Government health programs; by forbidding staff to treat patients on observation status and instead forcing them to admit the patients in almost every instance, regardless of whether the patient meets the criteria for inpatient admission; by discharging patients prematurely to maximize the profit realized on Medicare payments for inpatient care; and by refusing to readmit emergency room patients that were recently discharged in order to avoid a reduction in Prime's Medicare reimbursement payments for inpatient care.

49.     By virtue of the acts described above, Defendants have violated:

(1)     31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval; and/or

(2)     31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and/or

(3)     31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

50.     To the extent any of the conduct alleged herein occurred on or before May 20, 2009, Relators reallege that Defendants knowingly violated 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(2); and 31 U.S.C. § 3729(a)(7) prior to amendment, by engaging in the above-described conduct.

51.     By reason of the foregoing, the United States has suffered actual damages and is entitle to recover treble damages plus a civil monetary penalty for each false claim.

### JURY TRIAL DEMANDED

52.     Relators demand a jury trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Relators pray that the Court enter judgment against Defendants as follows:

(a) that the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Complaint, as the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*/provides;

(b) that civil penalties of $11,000 be imposed for each and every false claim that Defendants caused to be presented to the United States and/or its grantees, and for each false record or statement that Defendants made, used, or caused to be made or used that was material to a false or fraudulent claim;

(c) that attorneys' fees, costs, and expenses that Relators necessarily incurred in bringing and pressing this case be awarded;

(d) that Relators be awarded the maximum amount allowed to them pursuant to the False Claims Act; and

(e) that this Court order such other and further relief as it deems proper.

DATED: March 21, 2014          Respectfully submitted,

**THE WEISER LAW FIRM, P.C.**

Christopher L. Nelson (PA #85609)
James M. Ficaro (PA #308198)
Ross M. Wolfe (PA #316938)
22 Cassatt Avenue
Berwyn, PA 19312
Telephone: (610) 225-2677
Facsimile: (610) 225-2678

*Attorneys for Relators*

**JOSEPH TRAUTWEIN & ASSOCIATES, LLC**
Joseph Trautwein
17 Auchy Road
Erdenheim, Pennsylvania  19038
(215) 764-2301
jtrautwein@cpmiteam.com

*Attorney for Relators*

# EXHIBIT 1

## THIS FORM IS A PERMANENT PART OF THE MEDICAL RECORD

| Please return this form by fax to: |

Dear Dr._____   Date:_____

Coder/CDS'S Name:_____ Coder / CDS'S Phone #_____

*Exercise your independent professional judgment when responding to query.  Questions asked do not imply a particular answer is desired or expected.   We greatly appreciate your clarification on this issue.*

**Clinical Documentation States:**

"Syncope" is documented in .......

**Clinical Findings Show:**

**Please specify the cause as:**

[ ]  Autonomic Imbalance                    [ ]  Heat

[ ]  Orthostatic Hypotension                 [ ]  Psychogenic

[ ]  Shock                                   [ ]  Cardiac

[ ]  Vasovagal                               [ ]  Unable to determine

[ ]  Other:_____

**Present on Admission:**        [ ]  Yes (Y)        [ ]  Clinically undeterminable (W)        [ ]  No (N)

Please also document response in your Progress Notes and/or Discharge Summary and indicate if the condition was present on admission.

**Physician Signature:**_____   **Date:** _____

PATIENT ID

1 QU

**DOCUMENTATION INTEGRITY**
**PHYSICIAN QUERY FORM**
**SYNCOPE**
PHS (10/13)

# EXHIBIT 2

Table 1.  MD-DRG frequency by year at RMH.

Prime acquires
RMH (Feb.)

| | MS-DRG Code and Description | RMH Rate | 2011 | 2012 | 2013 | 2011/2013 % change |
|---|---|---|---|---|---|---|
| *Compare:* | 312: Syncope & Collapse | $4,096 | 108 | 113 | 90 | (17%) |
| *With, e.g.:* | 074: Cranial & Peripheral Nerve Disorders w/o MCC | $5,046 | 13 | 21 | 17 | 30% |
| *Compare:* | 641: Misc. Disorders of Nutrition, Metabolism, Fluids/Electrolytes w/o MCC | $3,978 | 77 | 71 | 50 | (35%) |
| *With, e.g.:* | 640: Misc. Disorders of Nutrition, Metabolism, Fluids/Electrolytes w/MCC | $6,377 | 19 | 31 | 29 | 53% |
| *Compare:* | 192: Chronic Obstructive Pulmonary Disease w/o CC/MCC | $4,000 | 88 | 45 | 17 | (81%) |
| *With, e.g.:* | 189: Pulmonary Edema & Respiratory Failure | $7,400 | 15 | 98 | 112 | 646% |
| *Compare:* | 690: Kidney & Urinary Tract Infections w/o MCC | $4,495 | 102 | 47 | 34 | (67%) |
| | 689: Kidney & Urinary Tract Infections w/ MCC | $6,789 | 34 | 33 | 22 | (35%) |
| *With, e.g.:* | 872: Septicemia or Severe Sepsis w/o MV 96+ Hours w/o MCC | $6,318 | 20 | 43 | 77 | 285% |
| | 871: Septicemia Or Severe Sepsis w/o MV 96+ Hours w/ MCC | $10,792 | 74 | 200 | 297 | 301% |
| | 870: Septicemia or Severe Sepsis w/ MV 96+ Hours | $33,519 | 8 | 13 | 29 | 263% |